## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 14-40019-EFM-1

JESUS ALBERTO MEDINA

*Defendant.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Jesus Medina's Motion to Suppress (Doc. 15). Medina contends that all evidence of methamphetamine obtained during an interstate traffic stop should be suppressed because he was unlawfully detained after the purpose of the stop was completed. The Court agrees and finds that the totality of the circumstances surrounding the stop did not rise to the level of reasonable suspicion required for the state trooper to detain Medina without his consent. Because the trooper lacked reasonable suspicion for an investigatory detainment, the Court grants Medina's motion to suppress.

### I. Factual and Procedural Background

On February 14, 2014, Kansas Highway Patrol Trooper Jerett Ranieri observed Jesus Medina driving a Chevy Malibu with a California tag by himself eastbound on Interstate 70 near exit 333 in eastern Kansas. By misreading an E for an F, a license tag check returned for a

Porsche SUV. The trooper stopped Medina, advised him that the tag was illegible, and suggested that he should wipe it off the next time he stopped for gas. When the trooper asked Medina if he owned the car, Medina replied he was going to see his aunt in Kansas for a week. He later clarified that his aunt lived in Kansas City, Kansas, and that he was driving from Anaheim. The trooper asked for the car's registration, and Medina produced it. The trooper again asked who owned the car, and Medina replied that it belonged to a family member. The trooper asked, "You don't know the name?" and Medina appears to have gestured toward the registration papers. The trooper replied "okay, okay" and then asked Medina for his driver's license. The vehicle was registered to Servando Lopez of Chino, California.

The trooper returned to his patrol car with the license and registration. The trooper learned that the registration and license were valid, the car was not reported stolen, and there were no warrants for Medina. At the suppression hearing, the trooper testified that while in the patrol car he made the decision to detain Medina because he suspected him of drug trafficking. The trooper listed the following observations in his report as the basis for his suspicion: Medina was very nervous and had shaky body language, was traveling on a known drug trafficking interstate and was coming from a known drug source area, had only one key on the key ring, was heading toward a large urban area, and had fast-food wrappers on the front passenger seat. The trooper also testified that he considered the vehicle's salvage title as another basis for his suspicion but conceded that he did not include it in his written report.

Approximately 11 minutes into the stop, the trooper issued Medina a warning and thanked him for his time. Medina left the vehicle and wiped down his tag. He returned to the vehicle, had his foot on the brake pedal, and was closing the door when the trooper asked if he could search the trunk. At about this time, the trooper's supervisor arrived at the scene. After

being patted down, Medina opened the trunk where the trooper observed a small overnight bag. The trooper asked to search inside the vehicle, and Medina declined. Shortly after Medina refused to allow the car to be searched, a canine unit arrived. The dog alerted on the car's front bumper, where approximately 11 pounds of methamphetamine eventually was discovered.

In March 2014, a federal grand jury returned an indictment charging Medina with one count of possession with intent to distribute methampethamine. In May 2014, Medina filed a motion to suppress the evidence, and the Court held a hearing on the motion in June 2014.

## II. Analysis

Medina's motion to suppress primarily challenges whether the trooper had sufficient reasonable suspicion of criminal activity to justify detaining him after issuing a warning. Medina does not challenge the initial stop but alleges that the trooper unlawfully extended the scope and duration of the stop and that the continued encounter was not consensual. In addition to arguing that the totality of the circumstances gave the trooper a reasonable articulable suspicion of criminal activity sufficient to justify an investigatory detainment, the Government challenges whether Medina had a reasonable expectation of privacy in a car he did not own. Because the Government essentially asserts that Medina lacks standing to file this motion, the Court first will address the issue of Medina's reasonable expectation of privacy.

### A. Medina Had a Reasonable Expectation of Privacy

The Fourth Amendment protects citizens from "unreasonable searches and seizures" conducted by state or federal government officials.[1] As the party seeking suppression, Medina

---

[1] U.S. CONST. amend. IV; *Mapp v. Ohio*, 357 U.S. 643, 655 (1961); *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009).

must demonstrate that it was his Fourth Amendment rights that were violated.[2] This principle is often called "standing," but the idea that personal Fourth Amendment rights must be at stake "'is more properly subsumed under substantive Fourth Amendment doctrine.'"[3] The party seeking suppression has the burden of citing facts at the suppression hearing indicating that his own rights were violated by the search.[4] The determination of whether a defendant's own Fourth Amendment rights were violated turns on two questions: 1) whether the defendant can show a subjective expectation of privacy in the area searched, and 2) whether society is prepared to recognize that expectation as objectively reasonable.[5]

In the context of an automobile search, the Tenth Circuit has held that for a defendant to show such a subjective expectation of privacy in an automobile, he bears the burden to show a legitimate interest in or lawful control over the car.[6] Mere possession of the car and its keys is not enough to establish a legitimate possessory interest.[7] In short, a "defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner."[8] The Tenth Circuit has observed that this does not mean that a defendant must show legal documentation establishing a chain of lawful custody from the registered owner to himself.[9]

---

[2] *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Davis*, 2014 WL 1797834, at *3 (10th Cir. May 7, 2014).

[3] *Rakas*, 439 U.S. at 139; *Davis*, 2014 WL 1797834, at *3.

[4] *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009).

[5] *Id.*

[6] *Id.* (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)).

[7] *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003).

[8] *Eckhart*, 569 F.3d at 1275.

[9] *Id.* (quoting *Valdez Hocker*, 333 F.3d at 1209).

But when the defendant is not the registered owner, he bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession.[10] A slight connection to the vehicle's lawful owner may suffice for standing.[11] On the other hand, no standing exists if a defendant—when asked—fails to establish any connection to the owner or a person with authority to grant possession.[12]

Generally, a person driving a borrowed car has a subjective expectation of privacy in the vehicle.[13] Specifically, in the context of a non-owner driver, the Tenth Circuit has held:

> The officer's testimony established that [the defendant] had claimed to have borrowed the car from the rightful owner and had produced a registration bearing the owner's name. Although such evidence may not be determinative of the Defendant's right to possess the car, absent evidence to the contrary, it is sufficient to meet his burden of demonstrating Fourth Amendment standing.[14]

---

[10] *Id.*

[11] *See Valdez Hocker*, 333 F.3d at 1209 (noting that a driver plainly would have a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle had he claimed that he personally obtained possession from the registered owner); *United States v. Orrego-Fernandez*, 78 F.3d 1497, 1502 (10th Cir. 1996) ("Here, Mr. Orrego-Fernandez introduced evidence that he had a reasonable expectation of privacy in the vehicle when he stated he received permission from the owner to use the truck."); *United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir. 1993) (concluding, "defendant here claimed to have borrowed the car from the rightful owner, and produced a registration bearing that individual's name. Although this evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car."); *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) (concluding that defendant has standing as long as he at least states that he gained possession from the owner); *United States v. Sanchez*, 2009 WL 3836398, at *4 (D. Kan. Nov. 16, 2009) (concluding that the defendant saying he "was driving the vehicle for the owner identified in the vehicle's documentation" was a sufficient statement to show he gained possession from the owner, in turn giving the defendant a reasonable expectation of privacy and standing to challenge the search).

[12] *See United States v. Betancur*, 24 F.3d 73, 77 (10th Cir. 1994); *United States v. Sanchez-Perez*, 2010 WL 2520651, at *3 (D. Kan. June 23, 2010).

[13] *See United States v. Jefferson*, 925 F.2d 1242, 1250 (10th Cir. 1991) (listing cases from other circuits).

[14] *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1179 (10th Cir. 1995) (citing *Soto*, 988 F.2d at 1553-54).

Here, the question is whether Medina established a link—even a slight connection—between himself and the registered owner. Medina did not testify at the suppression hearing, but his interaction with the trooper was presented through a DVD recording from the trooper's dashcam. Medina's responses are mostly inaudible. As best as can be discerned, the following brief exchange took place:

> Trooper: I'm just going to warn you about your tag. When you stop to get gas, you might try cleaning it off so we can see when it expires, your license plate. It's hard to see when it expires. And it comes back on a Porsche. Do you have papers, registration for it?
>
> Medina: (inaudible)
>
> Trooper: Is this your car? A friend's? Amigo's? Amigo or friend?
>
> Medina: (inaudible)
>
> Trooper: Oh, you came to see your aunt? Do you have papers or registration?
>
> Medina: (inaudible)
>
> Trooper: Thank you. What town?
>
> Medina: Kansas
>
> Trooper: You came to see your aunt in Kansas? Okay, I got you. Who owns the car?
>
> Medina: A family member.
>
> Trooper: You don't know their name?
>
> Medina: (inaudible, appears to be pointing or moving his right hand)
>
> Trooper: Okay, okay. Do you have any ID or a license?
>
> Medina: (hands over his California driver's license)
>
> Trooper: One day or something? How long are you going to stay? One day?

Medina: (inaudible)

Trooper: A week? And where's home?

Medina: (inaudible)

Trooper: Oh, Anaheim? Okay, okay. Kansas City, Kansas or Kansas City, Missouri?

Medina: (inaudible)

Trooper: Kansas City, Kansas? Do you know the street or anything? Is it on your phone?

Medina: (inaudible)

Trooper: (inaudible) . . . Just one second, and I'll get you out of here.

At the suppression hearing, the trooper admitted that he could hear Medina answer "a family member" on the recording when he asked Medina who owned the car. And the trooper testified, consistent with the recording, that Medina gave him registration papers bearing the rightful owner's name. The trooper confirmed that the car was not reported stolen. The trooper testified that Medina "could not tell me the name" of the owner. But when the trooper asked about the name, the recording shows that Medina made some sort of gesture involving the registration, but the recording did not pick up what was said.[15] Whatever happened, the trooper appeared to be satisfied with Medina's answer, responded "okay, okay," and moved on to ask for Medina's personal identification. The trooper admitted on cross-examination that he did not ask any follow-up questions about Medina's relationship with the car's owner.

_____

[15] At the suppression hearing, Medina's counsel offered in argument that Medina's response was "it's on there," referring to the owner's name on the registration. The Court noted at the time that it did not hear Medina's response because of the quality of the audio recording.

The Tenth Circuit has addressed a driver's reasonable expectation of privacy in a borrowed car. In *United States v. Angulo-Fernandez*, the driver of a stalled vehicle told an officer that he had borrowed the car from a friend, told the officer that the car belonged to Manuel Lucero, and produced a registration bearing Lucero's name.[16] In determining that the driver had an expectation of privacy in the car, the Tenth Circuit concluded that a defendant who 1) claims to have borrowed the car from the rightful owner, and 2) has produced a registration bearing the owner's name—absent evidence to the contrary—has shown sufficient evidence to meet his burden of demonstrating Fourth Amendment standing.[17]

The requirement for a link between the driver and the owner distinguishes this case from cases relied on by the Government that typically involve a driver claiming permission from a person with permission to loan the car from a third-party owner unknown to the driver.[18] In the absence of a third party, all that is required for standing is a slight connection between the driver and the vehicle's lawful owner.

---

[16] *See Angulo-Fernandez*, 53 F.3d at 1178.

[17] *Id*. at 1179; *See also Soto*, 988 F.2d at 1553-54 (concluding that defendant who "claimed to have borrowed the car from the rightful owner, and produced a registration bearing that individual's name" had shown sufficient evidence to confer standing); *United States v. Taylor*, 1998 WL 227161, at *1, 3-4 (D. Kan. April 18, 1998) (finding evidence sufficient for standing where a driver told an officer he had no idea how to pronounce the owner's last name but could do so after consulting insurance papers).

[18] *See Betancur*, 24 F.3d at 77 (finding no evidence presented of a link between the person who gave the defendant a truck and the registered owner of the truck); *United States v. Martinez*, 983 F.2d 968, 973 (10th Cir. 1992) (finding no expectation of privacy for driver who claimed to have borrowed the car from a friend but produced no evidence to show that the friend had any authority from the owner to grant permission to the driver); *United States v. Arango*, 912 F.2d 441, 445-46 (10th Cir. 1990) (finding no expectation of privacy because defendant failed to present any evidence that the person he got a truck from had gained lawful possession of the truck from the registered owners); *United States v. Erwin*, 875 F.2d 268, 271 (10th Cir. 1989) (finding no expectation of privacy when defendant failed to introduce evidence to show legitimate ownership or possession of an automobile); *United States v. Beauchamp*, 1996 WL 5079, at *4 (10th Cir. 1996) (finding no standing because there was no evidence of any relationship between the registered owner and the person who allegedly gave the defendant the car).

Here, Medina's link is weak, but it is sufficient for Fourth Amendment standing. Medina told the trooper that the car belonged to a family member and he produced registration bearing the owner's name. He indicated that a family member was the owner. The Government argues that Medina didn't know the name of the owner, but the evidence is not clear that that is the case. The trooper asked for the owner's name, Medina gestured to the registration papers, and the trooper seemed satisfied. If the trooper had asked a follow-up question, such as "do you know their name?" the analysis here might have reached a different conclusion. But that did not happen.

Medina's connection to the owner is certainly slight, but it is enough to show his subjective expectation of privacy in the vehicle, which is all that is required. Furthermore, society is prepared to recognize a borrower's expectation of privacy in a vehicle as objectively reasonable.[19] Therefore, the Court finds that Medina has Fourth Amendment standing to challenge the detention and subsequent search.

## B. Reasonable Suspicion for an Investigatory Detention

Courts have interpreted the Fourth Amendment to require various standards of reasonableness based on three categories of encounters between police and a citizen.[20] The three categories are consensual encounters, investigatory detentions, and custodial arrests.[21] These types of encounters may escalate from one to another.[22] A court must analyze each stage of the

---

[19] *See Soto*, 988 F.2d at 1554 ("Because defendant presented evidence that he was in lawful possession of the car at the time of the stop, his expectation of privacy in the contents of the car was objectively reasonable.").

[20] *See United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008); *United States v. Ortiz-Del Rio*, 2011 WL 1375430, at *2 (D. Kan. April 12, 2011).

[21] *See Ortiz-Del Rio*, 2011 WL 1375430, at *2.

[22] *White,* 584 F.3d at 945.

encounter to determine whether the required level of suspicion or cause is present at each stage.[23] A consensual encounter does not implicate the Fourth Amendment and does not require any suspicion, and a custodial arrest is reasonable only if supported by probable cause.[24]

In between is an investigatory detention, or a *Terry* stop, which is a "Fourth Amendment seizure[] of limited scope and duration and must be supported by a reasonable suspicion of criminal activity."[25] An officer must have an articulable and reasonable suspicion that a person is engaged in criminal activity to initiate a seizure by means of an investigative detention.[26] Without a reasonable articulable suspicion of other crimes, an officer must allow a driver to proceed on his journey once the purpose for initiating a traffic stop has been accomplished.[27]

A valid investigatory detention typically "involves no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated" than a custodial interrogation.[28] An investigatory detention must be based, at its inception, on an objectively reasonable and articulable suspicion that the person seized has or is engaged in criminal

---

[23] *Id*.

[24] *Id*. at 944-45.

[25] *United States v. Torres Guevara*, 147 F.3d 1261, 1264 (10th Cir. 1998); *Ortiz-Del Rio*, 2011 WL 1375430, at *2.

[26] *United States v. Madden*, 682 F.3d 920, 925-26 (10th Cir. 2012).

[27] *See United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996); *United States v. Hernandez-Lizardi*, 2011 WL 166724, at *3 (D. Kan. Jan. 19, 2011).

[28] *See Ortiz-Del Rio*, 2011 WL 1375430, at *2.

activity.[29] That means that the Court must determine whether the facts that the trooper knew at the time he made his decision to detain Medina are sufficient to establish reasonable suspicion.[30]

Reasonable suspicion exists only when an officer is aware of specific, articulable facts that form a basis for particularized suspicion when considered with objective and reasonable inferences.[31] Particularized suspicion means a reasonable suspicion that the particular person being stopped has committed a crime.[32] Reasonable suspicion does not exist if an officer can articulate only "an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'"[33] To determine if reasonable suspicion exists, the court considers the totality of the circumstances.[34]

Here, the trooper testified that he decided to detain Medina before he reapproached the vehicle to return the license and registration. Specifically, the trooper testified that even if Medina had said no to a consensual search, he believed that he "had enough reasonable suspicion to hold him there" and that Medina "was not free to leave." At this point, the encounter escalated beyond a *Terry* stop. Based on the evidence presented at the hearing, the Court finds that at the time the trooper decided to detain Medina he knew the following: 1) Medina appeared to the trooper to be nervous; 2) the vehicle had one key on the key ring; 3) Medina was driving on I-70, a known drug trafficking interstate, from Anaheim, California, a known drug source area, to

---

[29] *See United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998); *Ortiz-Del Rio*, 2011 WL 1375430, at *2.

[30] *See United States v. Poghosyan*, 2010 WL 4568988, at *13 (D. Kan. Oct. 28, 2010).

[31] *United States v. Cortez*, 449 U.S. 411, 418 (1981).

[32] *Id.*

[33] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

[34] *Id.*

Kansas City, Kansas, a common distribution point for drugs; 4) there were fast food wrappers on the front passenger seat; 5) Medina did not own the car and said he borrowed it from a family member to visit his aunt for a week; and 6) the vehicle had a salvage title. The Court examines these factors, both individually and in the aggregate, to determine if the trooper had reasonable suspicion to justify detaining Medina until the drug dog arrived.[35]

In *United States v. Arvizu*[36], the United States Supreme Court cautioned against using a "divide-and-conquer analysis" of potential reasonable suspicion indicators in isolation from each other without taking into account the "totality of the circumstances."[37] The Court reversed the Ninth Circuit and criticized the circuit court's methodology of evaluating and rejecting seven factors in isolation from each other without taking into account the totality of the circumstances of the search of a van near the Mexican border.[38] When looking at the totality of the circumstances, a court should give due weight to an officer's ability to draw on his own experience and specialized training to make inferences from and deductions about cumulative information available to them.[39] A determination that reasonable suspicion exists does not need to rule out the possibility of innocent conduct.[40] The Court concluded that each of the seven factors alone were susceptible to an innocent explanation and recognized that some factors were

---

[35] *See United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

[36] 534 U.S. 266 (2002).

[37] *Arvizu*, 534 U.S. at 274.

[38] *Id.*

[39] *Id.* at 273.

[40] *Id.* at 277.

more probative than others. But, taken together, the Court concluded that they were enough to form a basis for reasonable suspicion justifying a stop.[41]

The Tenth Circuit addressed a similar factual situation in *United States v. Simpson*.[42] There, a defendant found with drugs hidden in a car argued that he was unlawfully detained without reasonable suspicion after receiving a warning for an improper lane change.[43] The Tenth Circuit repeated that the court judges an officer's conduct in light of common sense and ordinary human experience, giving deference to an officer's ability to distinguish between innocent and suspicious actions.[44] This deference, however, is not unlimited.[45] The circuit court noted, "Even though reasonable suspicion may be founded upon factors consistent with innocent travel, '[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous.'"[46] In *Simpson*, the circuit court considered three main factors—criminal history, extreme nervousness, and inconsistent travel plans—in addition to 12 other facts testified to by the officer at a suppression hearing.[47] Noting that reasonable suspicion is not an onerous standard, the circuit court concluded that the trooper had reasonable suspicion to briefly detain the defendant for further investigation, calling it "a close call."[48] The circuit court found the trooper's knowledge of the defendant's previous conviction for transporting

---

[41] *Id.* at 277-78.

[42] 609 F.3d 1140 (10th Cir. 2010).

[43] *Id.* at 1145-46.

[44] *Id.* at 1146.

[45] *Id.* at 1147.

[46] *Id.* (quoting *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996)).

[47] *Id.* at 1145, 1147-53.

[48] *Id.* at 1153.

drugs the most significant, stating that it weighed heavily in favor of reasonable suspicion.[49] The court also addressed nervousness and inconsistent travel plans, factors relevant to this case.

### 1. Nervousness

The court noted that the Tenth Circuit has consistently held that nervousness is of limited significance for two reasons. First, "it is natural for a motorist to become more agitated as a stop is prolonged and particularly when the officer seems skeptical or suspicious."[50] Second, it is difficult even for a skilled officer to evaluate whether a person is acting normally for them or nervously without significant prior knowledge of the person.[51] The court, however, noted that "extreme and persistent nervousness," such as full body tremors, is entitled to somewhat more weight.[52] The court must examine specific indications that the defendant's nervousness was extreme rather than defer to an officer's naked assertion of extreme nervousness.[53]

Here, the trooper testified that Medina was "overly nervous" and "was very fidgety, just uncomfortable with my presence. His movement, quick body movements and fidgetiness and him handing over his license and registration was very shaky." The trooper also testified that Medina's nervousness did not lessen after receiving a warning ticket, noting that "it almost seemed like it elevated more, his nervousness, and it didn't go away. Normally we'll see if they know that they're going to get a warning, their nervousness will subside or go down, and it stayed elevated."

---

[49] *Id.* at 1147.

[50] *Id.*

[51] *Id.* at 1147-48.

[52] *Id.* at 1148; *See United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005) ("Only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion.").

[53] *Simpson*, 609 F.3d at 1148.

The Court concludes that the trooper's testimony did not describe a level of nervousness rising to the level of extreme and persistent.[54] At the suppression hearing, the Court questioned whether Medina actually looked nervous or merely seemed animated on the recording. Fidgety, uncomfortable, and shaky are all indicators consistent with natural agitation attributable to any citizen encountering police. Therefore, the Court attributes limited significance to Medina's nervousness but nevertheless considers it as part of the totality of the circumstances.

### 2. Travel plans

The Tenth Circuit also noted in *Simpson* that "[i]mplausible travel plans can contribute to reasonable suspicion" and addressed what constitutes an implausible travel plan.[55] The court stated that "lies, evasion or inconsistencies about any subject while being detained may contribute to reasonable suspicion."[56] But the court also noted that it "has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make."[57] To assess the weight given to inconsistent travel plans, the court must consider whether a person's "account of his travel plans was merely unusual or whether, in contrast, was sufficiently bizarre, inconsistent and evasive to constitute a factor contributing to reasonable suspicion."[58]

---

[54] *See Santos*, 403 F.3d at 1128-29 (noting that natural nervousness falls short of extreme nervousness that supports a finding of reasonable suspicion).

[55] *Simpson*, 609 F.3d at 1148 (quoting *Santos*, 403 F.3d at 1129).

[56] *Id*. at 1149.

[57] *Id*.

[58] *Id*. at 1151.

Here, there was limited information exchanged about Medina's travel plans. He told the trooper that he was traveling from Anaheim, California, to visit his aunt in Kansas City, Kansas, for a week and that he borrowed the Chevy Malibu from a family member. The Government goes to great length to question the authenticity of a 21-year-old male visiting an aunt for a week.[59] As stated at the suppression hearing, the Court notes that it knows people who are very close to their aunts. And Medina's story does not rise to the level of implausible or bizarre as contemplated by the Tenth Circuit or this Court.[60] A young man driving halfway across the country to visit an aunt for a week is, at most, more akin to a simply unusual or strange travel plan that a typical person may not make. For that reason, the Court declines to deem Medina's travel plans implausible or bizarre.

In addition, the trooper did not catch Medina in any lies or inconsistencies. The trooper testified that Medina did not name his aunt or give her address, but the trooper conceded that he did not ask for her name or specifically ask for her address after Medina indicated the address was in his phone. Similarly, the trooper testified that Medina did not name the car's owner, but the recording reveals that he did not specifically ask for the name and seemed satisfied when Medina indicated the name was on the registration papers. The Court does not find it suspicious

---

[59] Government's Response to Defendant's Motion to Suppress, Doc. 16, at 21 ("A young man might drive some reasonable distance to see an aunt, even alone, but he would never plan to visit for an entire week. Once he had seen the aunt's recent knitting projects and petted her cats, what would a 21 year old male do?").

[60] *See, e.g.*, *Simpson*, 609 F.3d at 1149 ("For example, a police officer could reasonably believe a travel plan was implausible—and the person was lying—if that person claimed that he or she had left a certain city by car an hour ago if the officer pulled over that person, 200 miles from the city."); *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009) (finding bizarre a defendant's story of driving a rental car from Las Vegas to Indianapolis to take a friend to work and returning the next day); *United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995) (finding implausible a defendant's story that he was driving from California to North Carolina merely to deliver a very dilapidated sofa to some friends); *Hernandez-Lizardi*, 2011 WL 166724, at *3 (noting that this Court found bizarre a defendant's travel plans to drive a passenger to Denver to repair a car for a friend, drive the passenger back to Kansas City, and then drive home to California); *Poghosyan*, 2010 WL 4568988, at *14-15 (noting that this Court found "truly bizarre" a driver's travel plans to drive from California to Chicago to attend a bachelor party for a person he did not know with no knowledge of when the party was or when he was returning to California).

-16-

for a citizen not to volunteer information he is not asked. To the extent Medina's responses may be construed as evasive, they do not rise to the level of sufficiently evasive to constitute a factor contributing to reasonable suspicion.[61]

The trooper testified that he thought it was suspicious that Medina was traveling from a known source area for narcotics to a known destination hub for narcotics. The Tenth Circuit has given "no credence" to an officer's testimony that a defendant was traveling on a major "drug corridor."[62] This is so "[b]ecause law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, however, the probativeness of a particular defendant's route is minimal."[63] Therefore, the Court does not consider Medina's travel route as adding much, if anything, to the determination of reasonable suspicion.

### 3. Other asserted factors

The trooper also testified that he observed one key on the key ring, fast-food wrappers in the passenger seat, and that the car carried a salvage title. Officers, including the trooper here, have testified that they consider a single key on a key ring to be an indicator of drug trafficking.[64] However, the Tenth Circuit has not addressed the significance of the observation other than to note that a single key is a weak indicator that it belongs to a car not regularly driven

---

[61] *See Santos*, 403 F.3d at 1131 ("With the benefit of hindsight—the discovery of commercial quantities of narcotics in his car—we know that [the defendant's] story was just a cover. But the inconsistencies and gaps in his story were not so significant that they would arouse genuine suspicion in the absence of other indications of wrongdoing.").

[62] *Simpson*, 609 F.3d at 1152 n.3.

[63] *White*, 584 F.3d at 951-52.

[64] *See United States v. Vazquez*, 555 F.3d 923, 926 (10th Cir. 2009); *United States v. Guerrero*, 472 F.3d 784, 785 (10th Cir. 2007); *United States v. Leyva*, 442 Fed. Appx. 379-80 (10th Cir. 2011); *United States v. Marquez-Diaz*, 325 Fed. Appx. 637, 638-39 (10th Cir. 2009); *United States v. Trujillo*, 2006 WL 2524156, at *5 (D. Kan. Aug. 30, 2006).

by the driver.[65] That is consistent with Medina's story that he borrowed the car from a family member. Similarly, officers have testified that a salvage title may be an indicator of drug trafficking.[66] But the Tenth Circuit has not addressed its significance, and the Court declines to attach much, if any, significance to a vehicle carrying a salvage title. Finally, any suspicion associated with fast-food wrappers has been deemed "virtually nonexistent" by the Tenth Circuit.[67] While these factors appear to be largely insignificant, they must be included for consideration when determining whether the totality of the circumstances created reasonable suspicion for Medina's detention.

### 4. Totality of the factors

In assessing the totality of the factors, the question is whether the trooper's suspicion was "reasonable" and "articulable rather than a hunch that turned out to be accurate."[68] Here, the trooper was clearly suspicious of Medina—he questioned him about his travel plans and the ownership of the car, called for assistance, asked to search the car, patted him down, and detained him long enough for a drug-sniffing dog to arrive. The Court's charge is not to determine whether any one of the trooper's stated indicators were enough to form the basis for reasonable suspicion. As the U.S. Supreme Court has admonished, it would be legal error to employ such a divide-and-conquer strategy.[69] Rather, the Court is asked whether a trooper who

---

[65] *Guerrero*, 472 F.3d at 788.

[66] *See, e.g.*, *United States v. Perales*, 2008 WL 4974807, at *1 (D. Kan. Nov. 19, 2008) ("Based on his experience and training, [the trooper] knew that drug couriers sometimes use salvaged vehicles for transportation of illegal narcotics.").

[67] *Wood*, 106 F.3d at 947.

[68] *Simpson*, 609 F.3d at 1152-53.

[69] *Santos*, 403 F.3d at 1133.

has lawfully stopped a person on Interstate 70 is allowed to continue to detain that person for a short period of time when that person has expressed possibly unusual travel plans, seems nervous, and has one key on the key ring for a borrowed car with a salvage title with food-fast wrappers in the passenger seat.  The Government concedes that some of these factors are weak but argues that considering all of the factors together justifies the detention. Indeed, all of the factors must be taken into consideration, though some factors do not weigh much and some add nothing at all.[70]

Although a close call, the Court concludes that the trooper did not have reasonable suspicion that criminal activity was afoot and had no right to detain Medina for further investigation. Though reasonable suspicion is not meant to be an onerous standard, the totality of the handful of weak or valueless indicators here falls short of the relatively low bar.[71] Notably, Tenth Circuit cases finding reasonable suspicion on similar facts turned on the driver's prior criminal history, which is not alleged to be a factor here.[72] On the facts of this case as a whole, the factors cited by the trooper collectively are insufficient to support a finding that reasonable suspicion existed to detain Medina after the lawful traffic stop concluded. The trooper's suspicion here is more akin to a hunch that turned out to be accurate. For these reasons, the Court grants Medina's motion to suppress.

---

[70] *See id.*

[71] *See Wood*, 106 F.3d at 948 ("Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'").

[72] *See Simpson*, 609 F.3d at 1147 (concluding that the trooper's knowledge of a driver's criminal history of transporting drugs "weighs heavily in favor of finding reasonable suspicion"); *Santos*, 403 F.3d at 1132 ("But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.").

**IT IS THEREFORE ORDERED** that the Motion to Suppress (Doc. 15) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 8th day of July, 2014.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE